Paul SCHMIDT *v.* Gary STEARMAN

CA 06-726                                                    253 S.W.3d 35

Court of Appeals of Arkansas
Opinion delivered March 14, 2007

*Harry McDermott*, for appellant.

*Everett, Wales & Mitchell*, by: *Randall Wakefield*, for appellee.

SARAH HEFFLEY, Judge. Appellant Paul Schmidt sued appellee Gary Stearman for conversion, trespass, and the tort of outrage. The trespass and outrage counts were dismissed by directed verdict, and the conversion count went to a jury, which found in favor of Stearman. Schmidt appeals, seeking a new trial on his conversion claim; reversal of the directed verdicts on trespass and outrage; and a ruling that the trial court erred in excluding certain evidence and refusing two proffered jury instructions. We reverse and remand for a new trial on Schmidt's cause of action for conversion; all other rulings are affirmed.

The pertinent acts occurred on a 458-acre farm in Washington County, which had been in Schmidt's family for many years. In 1996, the family corporation deeded the property to the Farm Services Agency (FSA) to extinguish a debt. In 1997 and 1998, the FSA leased the land back to Schmidt for five years, and Schmidt lived there, paying rent to the government agency. At the conclusion of the lease terms, Schmidt tried to enforce what he believed was an agreement by the FSA to allow him to repurchase the farm. The FSA did not offer to sell the farm to Schmidt, but, for a time, Schmidt remained on the property anyway without paying rent.

In June or July 2004, the FSA quitclaimed the farm to Travis Stearman, the son of appellee Gary Stearman, a nearby property owner. Schmidt considered the sale unauthorized and stayed on the land. A few months later, Travis requested $200 per month rent from Schmidt. According to Schmidt, he refused to pay it;

according to the Stearmans, he agreed to pay it. In any event, the $200 monthly rent was never paid.

In early 2005, Gary Stearman, at his son's request, hired an attorney and a process server to begin eviction proceedings against Schmidt. The process server said that she was unable to locate Schmidt to serve him personally, so she posted an eviction notice on Schmidt's house on February 23, 2005 (and possibly on March 3, 2005). The notices informed Schmidt that he must vacate within twenty days or litigation would be commenced seeking his forcible removal.

According to Schmidt, he was initially unaware of the notices, and in late March 2005, he and his girlfriend, who also lived on the property, went on vacation. Before doing so, they left food for Schmidt's dogs (water was available from a nearby spring). When Schmidt returned in early or mid April, the house's electric meter had been disabled, and he called the electric company to have service restored. It was at this time, he claimed, that he discovered the eviction notice "out in the bushes next to the back door." Schmidt contacted attorney Harry McDermott, who wrote a letter to Stearman's attorney on April 15, 2005, advising that Schmidt had not agreed to pay rent and considered the sale of the property to Travis Stearman illegal.

Thereafter, Schmidt said, he and his girlfriend re-provisioned the dogs and left on another short trip. They returned on or about April 17, and Schmidt noticed that a pry bar had been used to gain entry to the house. The inside of the house, he said, had been "trashed" and "ransacked" and looked "like a tornado had gone through." According to him, nearly 100 items were missing from the house, including such things as china, furniture, antiques, jewelry, and firearms. He also discovered that all five of his dogs, whom he considered his "children," had been shot to death. Schmidt called the sheriff and apparently expressed his suspicion that Gary Stearman had committed these acts. However, according to Schmidt, the sheriff would not arrest Stearman and considered the situation to be a "civil matter." Schmidt and his girlfriend decided to leave the house because they feared for their lives. They stayed in a motel for a while, then lodged with a friend.

Gary Stearman later admitted that he broke into Schmidt's house, arranged for the personal property to be removed, and shot the animals. He also acknowledged that he had asked a mechanic to take a tie rod from an old Mack truck on Schmidt's property. At

trial, he gave the following context to his actions. After hiring an attorney and having the eviction notices posted, he drove by Schmidt's house in April 2005. He said that he saw newspapers piled up by the mailbox, an un-mowed, debris-strewn yard, and dogs that "didn't have any food"; according to him, it looked as if nobody had lived there for a long time.[1] He assumed that Schmidt had vacated the premises as ordered. He entered the property and "beat on the door numerous times" but received no answer. He said that he pried open the door and walked through the house to make sure that Schmidt was not "laying in there dead." He observed that the utilities and the refrigerator were on and saw a lot of "junk" in the house but did not see Schmidt, so he left. Before doing so, however, he shot Schmidt's dogs and "slung them over the brush," even though he acknowledged that he was acquainted with the dogs, knew they were pets, and had never had any trouble with them. Stearman said that he thought killing the dogs was the humane thing to do because they had been "abandoned" and could turn "wild." Upon arriving home, he told his ex-wife that "it looks like Schmidt has pulled out, just like I thought he would, and left all that mess up there." He told her "if there's anything up there that you want, then help yourself to it because I'm going to doze it down." According to Mrs. Stearman, she retrieved several items from the house and stored them in a shed on hers and Stearman's property (although she said that she did not take everything that Schmidt would later claim).

The sheriff did get involved in the matter, and shortly after the property was removed, he called Stearman and asked him if he had taken anything from Schmidt. Stearman said that he had not but his wife had. Mrs. Stearman, embarrassed by the matter, told the sheriff she would return the property; Stearman likewise said that he would make sure that Schmidt got his property back and that he was prepared to deliver his things to him. Mrs. Stearman said that she kept waiting for Schmidt to call regarding the property, but he did not.

Schmidt filed suit against Gary Stearman on April 20, 2005, just three days after he discovered that the incident occurred. He sought compensatory and punitive damages for trespass, outrage, and conversion. Sometime thereafter, Mrs. Stearman called Schmidt and spoke to him about returning his property, but he said

---

[1] The local police chief also said that he had driven by the Schmidt house several times in early 2005 and that the property looked "abandoned."

that the return was not convenient at that time because, according to Schmidt, he was still living in a motel. Eventually, the goods were returned to Schmidt in November or December 2005 when he was living with his friend, although, according to Schmidt, he did not get all of the property back.

The case went to trial in January 2006. At the close of Schmidt's proof, the trial court directed a verdict for Stearman on trespass and outrage. The conversion case was fully tried, and, after deliberations, the jurors filled out the verdict form as follows:

> We, the Jury, find for the plaintiff, Paul Schmidt, and award him damages in the amount of $_____.
>
> [Unsigned signature lines]
>
> ### OR
>
> We, the Jury, find for the defendant, Gary Stearman, Sr. [sic], on the complaint of the plaintiff, Paul Schmidt.
>
> [Nine signatures]

Judgment was entered, and Schmidt moved for a new trial on the ground that the jury's verdict was clearly contrary to the preponderance of the evidence. The motion was denied, and this appeal followed.

### Denial of Motion for New Trial

We first address Schmidt's argument that the trial court erred in denying his motion for a new trial on conversion. When a motion for a new trial is made on the ground that the verdict is clearly contrary to the preponderance of the evidence, we affirm the denial of the motion if the jury's verdict is supported by substantial evidence. *Barringer v. Hall*, 89 Ark. App. 293, 202 S.W.3d 568 (2005). Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.* We give the verdict the benefit of all reasonable inferences in accordance with the proof. *Id.* It is only where there is no reasonable probability that the incident occurred according to the version of the prevailing party or where fair-minded persons can only draw a contrary conclusion that a jury verdict should be disturbed. *Id.*

Conversion is a common-law tort action for the wrongful possession or disposition of another's property. *Buck v. Gillham*, 80 Ark. App. 375, 96 S.W.3d 750 (2003). The tort of conversion is

committed when a party wrongfully commits a distinct act of dominion over the property of another that is inconsistent with the owner's rights. *Id.* The intent required is not conscious wrongdoing but rather an intent to exercise dominion or control over the goods that is in fact inconsistent with the plaintiff's rights. *Id.* A person can be held liable to the true owner of stolen personal property for conversion notwithstanding that he or she acted in the utmost good faith and without knowledge of the true owner's title. *Id.*

In the present case, the basic elements of conversion were proven beyond dispute. Several of Schmidt's possessions were taken, and they were taken with the clear intent to exercise dominion and control over them in a manner inconsistent with Schmidt's ownership — Stearman told his ex-wife to "help herself" to the items in the house; the items were removed from the house and placed in a shed on the Stearman land; and Stearman ordered his mechanic to remove a part from Schmidt's Mack truck. But, despite this undisputed proof, Stearman offers several justifications for the jury's finding in his favor.

We first consider Stearman's claim that the jury may have determined that Mrs. Stearman, who was not a party to the case, was the converter. We disagree. Stearman was fully aware that, at his invitation, his ex-wife took several things from the house. In fact, Stearman's counsel told the jury in closing arguments that "I have no question that Ms. Stearman went there as an agent for Mr. Stearman." A principal, knowing of the acts of his agent, or of acts putting him on notice thereof, who fails to object, cannot be heard to deny his agency but will be held to have acquiesced in and ratified the agent's acts. *Brown v. Md. Cas. Co.*, 246 Ark. 1074, 442 S.W.2d 187 (1969). Moreover, a conversion need not be a manual taking or for the defendant's own use. *Elliott v. Hurst*, 307 Ark. 134, 817 S.W.2d 877 (1991). If the defendant exercises control over the goods in exclusion or defiance of the owner's rights, it is a conversion, whether it is for the defendant's own use or another's use. *Hatchell v. Wren*, 363 Ark. 107, 211 S.W.3d 516 (2005); *Grayson v. Bank of Little Rock*, 334 Ark. 180, 971 S.W.2d 788 (1998). Moreover, it is undisputed that Stearman himself was responsible for taking the truck part. In light of these factors, the jury's verdict could not reasonably have been rendered on this basis.

Stearman also argues that the jury could have concluded that Schmidt abandoned his property. Abandonment of property before a defendant takes possession is a defense to conversion. *See* 18 AM. JUR. 2D *Conversion* § 102 (2d ed. 2004); 90 C.J.S. *Trover & Conversion* § 66 (2002). Abandonment requires a manifest act that expresses the intent of the owner to forsake his or her property. *Routh Wrecker Serv., Inc. v. Wins*, 312 Ark. 123, 847 S.W.2d 707 (1993). Property is abandoned when it has been thrown away or its possession voluntarily forsaken by the owner. *Id.*

■ The evidence in this case, even when viewed in the light most favorable to Stearman, would not support a finding that Schmidt abandoned his personalty. Stearman acknowledged that, at the time he entered the house, the power was on and the refrigerator was running. Schmidt also testified, without contradiction, that he was on vacation when his property was taken. Most importantly, on or about April 15, Schmidt asked his attorney to write a letter, which stated, in part, that "taking any personal property from the homestead" would be reported to the sheriff. This letter, written on Schmidt's behalf a few days before the taking, cannot be reconciled with any intention to forsake his property.

■ Stearman contends, however, that the property looked as though it had been abandoned and that he committed no "conscious wrongdoing" because, at the time the property was taken — on or before April 15 — he could not possibly have read the April 15 letter. Conscious wrongdoing is not the requisite intent for conversion. *See Car Transp. v. Garden Spot Distribs.*, 305 Ark. 82, 805 S.W.2d 632 (1991). What is required is the intent to exercise control or dominion over the goods that is in fact inconsistent with the plaintiff's rights. *Id.* Conversion can occur even where the person who took the property is operating under a mistaken belief. *See id.* So, the question is not whether Stearman believed that the property had been abandoned but whether it had been abandoned in fact. And, the proof in this case simply does not support a finding of abandonment in fact.

Stearman asks us to consider another aspect of abandonment as set forth in Ark. Code Ann. § 18-16-108 (Repl. 2003), which reads:

(a) Upon the voluntary or involuntary termination of any lease agreement, all property left in and about the premises by the lessee

shall be considered abandoned and may be disposed of by the lessor as the lessor shall see fit without recourse by the lessee.

(b) All property placed on the premises by the tenant or lessee is subject to a lien in favor of the lessor for the payment of all sums agreed to be paid by the lessee.

This is the landlord lien statute. *See Harris v. Whipple*, 63 Ark. App. 84, 974 S.W.2d 482 (1998). According to Stearman, he was entitled to dispose of Schmidt's property under this statute because the property was left there after termination of a "lease agreement," referring to Schmidt's alleged oral agreement to pay $200 to Travis Stearman.

■ Even if the oral lease existed, Gary Stearman was not a "lessor" whom the statute permits to dispose of a tenant's property. If there was a lessor, it was Stearman's son, Travis, and there is no evidence that, in taking dominion over the personalty, Stearman was acting on his son's behalf. He did not give the personalty to Travis or sell it for overdue rent. Rather, he offered it to his ex-wife for her personal use. The statute therefore does not apply.

Finally, we address a possible basis for the jury's verdict that the parties mention only in passing — the Stearmans' return of the property to Schmidt. The fact that items are eventually returned does not necessarily bar recovery of damages for conversion but may mitigate the damages. *See McQuillan v. Mercedes-Benz Credit Corp.*, 331 Ark. 242, 961 S.W.2d 729 (1998). Generally, the law permits evidence of the return of the property to its owner in mitigation of damages only when the following circumstances are present: 1) the owner must have accepted the return of the goods; 2) the original conversion occurred by mistake; and 3) the return of the goods occurred promptly after the discovery of the mistake and before the commencement of the action for conversion. *See id.*[2]

■ We read *McQuillan* to say that a defendant's return of property is evidence to be considered in mitigation of damages; we do not read it to say that the return of property negates the

---

[2] The jury was instructed in accordance with *McQuillan*, but the instruction added language not found in *McQuillan*, stating that the return or *offer to return* must occur promptly after discovery of the mistake and before a lawsuit is filed. Although not raised as an issue in this appeal, we note this discrepancy, given the possibility that the instruction may be given on remand.

conversion. Thus, the jurors in this case, if they gave credence to the Stearmans' return of the property, were constrained to fill out their verdict form in favor of Schmidt on conversion but award a reduced amount, possibly zero, in damages. The return of property could not support the jury's outright finding in favor of Stearman, which amounts to a finding that no conversion took place.

Based on the foregoing, we hold that the jury's verdict was not supported by substantial evidence, and we reverse and remand for a new trial on the conversion count.

### Directed Verdict — Trespass

The trial court directed a verdict in Stearman's favor on Schmidt's claim for trespass to realty. A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Rose Care, Inc. v. Ross*, 91 Ark. App. 187, 209 S.W.3d 393 (2005). Substantial evidence is that which is of sufficient force and character that it will compel a conclusion one way or another; it must force or induce the mind to pass beyond suspicion or conjecture. *Id.* In determining whether a directed verdict should have been granted, the appellate court reviews the evidence in the light most favorable to the party against whom the verdict is sought and gives it its highest probative value, taking into account all reasonable inferences deducible from it. *Id.* Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented.

Proof of ownership or the right to possession of property is necessary for the maintenance of a trespass action. *See Dugal Logging v. Ark. Pulpwood Co.*, 66 Ark. App. 22, 988 S.W.2d 25 (1999). It is undisputed that Schmidt had no title to the 458-acre farm at the time this cause of action arose in 2005. In fact, title had resided in others for nine years — Schmidt's family corporation deeded the farm to the FSA in 1996, and the FSA deeded it to Travis Stearman in 2004. Moreover, Schmidt's five-year leases with the FSA expired in 2002 and 2003, and, according to him, he did not lease the property from Travis Stearman. Thus, Schmidt merely occupied the land under the belief that the FSA should have given him the right to repurchase it. We agree with the trial court that this was not enough to allow Schmidt to pursue a trespass action.

Schmidt cites several older cases for the proposition that, to maintain an action for trespass, a person must have either legal title

*or actual possession,* which he contends he had. *See Newman v. Mountain Park Land Co.,* 85 Ark. 208, 107 S.W. 391 (1908); *Price v. Greer,* 76 Ark. 426, 88 S.W. 985 (1905); *Taylor v. State,* 65 Ark. 595, 47 S.W. 1055 (1898); *Merrick v. Britton,* 26 Ark. 496 (1871). But, none of those cases involve a situation in which a person's bare occupation supports a trespass action against one who entered the realty at the behest of the titled owner. We therefore affirm the directed verdict for trespass.

### Directed Verdict — Outrage

Four factors are necessary to establish the tort of outrage: 1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; 2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; 3) the actions of the defendant were the cause of the plaintiff's distress; and 4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Cincinnati Life Ins. Co. v. Mickles,* 85 Ark. App. 188, 148 S.W.3d 768 (2004). Conduct that meets the standard for outrage must be determined on a case-by-case basis. *Id.*

Schmidt argues that the directed verdict on this count was improper because Stearman, among other things, "arranged" for his son to buy the farm despite Schmidt's ongoing dispute with the FSA, ransacked the house and took property from it, and shot Schmidt's dogs, who were harmless pets. Particularly with regard to the killing of the dogs, we agree that, under the circumstances of this case, a jury might well consider Stearman's actions heartless and gratuitous, exceeding all possible bounds of decency. Nevertheless, we must conclude that the directed verdict was proper because Schmidt failed to offer proof of an essential element of outrage — that he sustained emotional distress so severe that no reasonable person could be expected to endure it.

Schmidt's physician, Dr. Kathy Mayhew, testified that Schmidt suffered from various medical conditions related to diabetes and that, when she began treating him in 2002, he was depressed "over dealing with the burden of his medical problems." In March 2004, she renewed a Zoloft prescription for him that had been prescribed by another doctor. Later, in 2005, she saw him again and learned that, although he had discontinued taking Zoloft at some point, he started taking it again in 2005 after the incidents

that gave rise to this case. She said that she continued him on Zoloft thereafter because he "continued to be depressed," not only because of his "medical conditions that have not resolved but because of the extra stress with what's going on with his family farm and his dogs being shot." Schmidt testified that, after the incident, he started taking his antidepressant medication again and that he was afraid to stay in the house.

■ Much greater proof is required to state a claim for outrage. For example, in *FMC Corp. v. Helton*, 360 Ark. 465, 202 S.W.3d 490 (2005), there was evidence that the plaintiffs were unable to sleep, suffered anxiety, lost weight, started taking antidepressants, and felt devastated. The supreme court said that those feelings did not "satisfy the type of distress encompassed by a claim for outrage," and affirmed a directed verdict for the defense. *Id.* at 486, 202 S.W.3d at 505. Likewise, Schmidt's recurrence of depression and his fear of staying on the farm do not satisfy the requirements for outrage. The directed verdict is affirmed.

### Exclusion of Evidence

At trial, Schmidt tried to admit copies of his FSA leases, a copy of a lawsuit he had recently filed to set aside the FSA's deed to Travis Stearman, copies of letters that he wrote to the FSA, testimony that he could have made financial arrangements to buy back the property if the FSA had offered it to him, testimony from an attorney explaining his FSA lawsuit, and other, similar evidence. The trial court excluded this evidence as irrelevant.

Evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Peterrie Transp. Serv. v. Thurmond*, 79 Ark. App. 375, 90 S.W.3d 1 (2002). It is within the sound discretion of the trial court to determine what evidence is relevant and what is prejudicial, and the appellate court will not reverse the trial court's decision regarding relevancy absent an abuse of discretion. *Id.* Nor will we reverse a trial court's evidentiary ruling without a demonstration of prejudice. *Baker Refrig. Sys. v. Weiss*, 360 Ark. 388, 201 S.W.3d 900 (2005).

■ We cannot see how Schmidt was prejudiced by the trial court's ruling. The goal of the proffered evidence was to explain Schmidt's belief that he had a legally defensible right to be on the property and to show that he was trying to set aside the sale

of the land. Yet, at numerous points throughout the trial, the jury heard the detailed story of Schmidt's litigation with the FSA, his belief that he was entitled to buy the property back from the FSA, and the fact that he had filed a separate lawsuit to set aside the sale to Travis Stearman. In reviewing the record, we believe that Schmidt was able to get his point across to the jury, despite the trial court's evidentiary rulings. We therefore decline to reverse on this ground.

### Refusal to Give Jury Instructions

The trial court refused to give the following jury instructions proffered by Schmidt:

> No. 1: If Travis Stearman knew at the time of his purchase from the FSA that Paul Schmidt was in possession or control of the land, it was his duty to make reasonable inquiry as to what right or authority Paul Schmidt had [sic] such possession and the extent of his rights on the land, and is [sic] chargeable with knowledge of whatever he might have learned by such inquiry.
>
> The rights of the lessee of the property under a lease are not extinguished by the sale of the property during the term of the lease to one having notice of it.
>
> . . . .
>
> No. 2: The rights of Paul Schmidt, if any, under his lease agreement of the property would not be extinguished by the sale of the property during the term of the lease to one having notice of it. The purchaser of the land by [sic] would be subject to Paul Schmidt's rights, if any, under his lessee agreement.

A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *Williams v. First Unum Life Ins. Co.*, 358 Ark. 224, 188 S.W.3d 908 (2004). We will not reverse a trial court's refusal to give a proffered instruction unless there was an abuse of discretion. *Id.*

Schmidt argues that the court should have given these instructions because it also gave an instruction that a tenant who refuses to pay rent and refuses to vacate the property shall be guilty of a misdemeanor. However, he fails to offer a convincing expla-

nation that the proffered instructions were either warranted or supported by the evidence. The instructions basically tell the jury that Schmidt's rights under "his lease," apparently referring to his lease with the FSA, were not extinguished by the sale to Travis and that Travis (who is not a party to this action) had a duty to inquire further as to Schmidt's rights in the land. Whatever point Schmidt sought to make with these instructions, the fact remains that his leases with the FSA had expired by the time Travis bought the property in 2004. The authorities Schmidt cites for these instructions involve a buyer of land who takes subject to an *existing* lease. *Prince v. Alford*, 173 Ark. 633, 293 S.W. 36 (1927); *Sullivan v. Wilson Mercantile Co.*, 168 Ark. 262, 271 S.W. 30 (1925). Schmidt has not met his burden of showing error on this point.

To conclude, Schmidt's cause of action for conversion is reversed and remanded for a new trial; the trial court's directed verdicts, evidentiary rulings, and refusal to give jury instructions are affirmed.

Affirmed in part; reversed and remanded in part.

VAUGHT and MILLER, JJ., agree.